UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

---

| | | |
|---|---|---|
| ESTATE OF JESSE TURNBOW & | : | |
| JACINDA SCRUGGS, | | |
| Plaintiffs, | : | |
| | | Case No. 1:07-CV-114 |
| vs. | : | Judge Tena Campbell |
| | | |
| OGDEN CITY, OFFICER ED MAHON, | : | |
| OFFICER JOHN SATTELMAIR, & | | |
| OFFICER DEREK DRAPER, *et al.* | : | Report of Kenneth R. Wallentine |
| Defendants. | | |

---

The following report of Kenneth R. Wallentine is submitted after review of the following documents, pleadings, records, and reports: transcripts of Officer Derek Draper, Officer Ed Mahon, Officer John Sattelemair, Lupe Castillo, Ryan Edwards, Esther Green, Shawn Hamblin, Gary Heward, Carolyn Moore, Eric Roberts, Larry Wade depositions; John Gomez, Patricia Gomez, Liza Lopez and Eric Roberts witness statements and interview transcripts; the report of plaintiffs' experts; police training records; documents produced by plaintiffs and defendants; video recording of the incident scene; photographs and diagrams; and policies and procedures of the Ogden City Police Department.

Kenneth R. Wallentine states as follows:

1.　　I am a law enforcement officer in the State of Utah.  I serve as Chief of Law Enforcement for the Utah Attorney General.  I was formerly employed as Investigations Bureau Chief at the Utah Department of Public Safety, Peace Officer Standards and Training Division, where I supervised investigations into allegations of improper conduct, excessive force, officer integrity, and criminal acts alleged to have been committed by certified and certifiable law enforcement officers.  I also had responsibility for policy drafting and review for the parent agency, the Utah Department of Public Safety.  I was certified as a law enforcement officer in the State of Utah in 1982.  My present duties include direct supervision and command of four Investigation Sections, supervising approximately thirty-five law enforcement officers, forensic specialists, and technicians directly in my employ, several additional part-time sworn officers, as well as several other law enforcement officers assigned to my agency in cooperative interagency agreements or task forces.  I directly supervise the State of Utah Child Abduction Response Team and the Officer-Involved Fatality Investigation Team.

2.　　I was formerly responsible for providing delivery of the Basic Training Curriculum related to all legal subjects, as well as certain tactical subjects, and a variety of In-service subjects, at the Utah Law Enforcement Academy.  I continue to teach at the Utah Law Enforcement Academy.  I am the author of the police academy curriculum currently in use for several subjects, including, but not limited to, use of force, reasonable force, use of force and police service dog teams, search and seizure, search and seizure for police service dog teams, internal affairs investigations legal issues, officer misconduct and discipline, and use of force/firearms instructor liability.  I regularly teach in the Basic Training and In-service programs of the Utah State Police Academy,

and occasionally teach in other law enforcement academies. I regularly teach in the following specialized courses: Advanced Officer Course, Employee Discipline and Administrative Procedures Course (formerly known as Internal Affairs), Firearms Instructor Course, First Line Supervisor Course, POST K9 Unit Administrator Course, POST Patrol Dog Handler Course, POST Narcotics Detector Dog Course, and others. I am a POST-certified Law Enforcement Firearms Instructor. I have been the principal firearms instructor for the Utah POST Law Enforcement Official and Judge Firearms Training Program for the past several years. I created the curriculum and served as a principal instructor for the Utah POST Command College. In cooperation with the Utah Sheriffs Association and the Utah Jail Commanders Association, I teach investigation of officer-involved fatalities and in-custody deaths, employee selection, employee discipline and internal affairs courses to county law enforcement and corrections command staff. I frequently present risk management courses for law enforcement executives and county and municipal legal counsel and specifically instruct on the adequacy of police training.

3.      I am a licensed attorney, having practiced law on at least a part time basis since 1990. I am admitted to practice before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits, and the State and Federal courts in the State of Utah. I am a Master of the Bench of the American Inns of Court, Inn One, where I also serve as President of the Inn of Court. I am an appointed Administrative Law Judge for the State of Utah and for certain counties and cities in Utah.

4.      In addition to my primary employment, I occasionally consult and provide expert opinions on police procedures, and use of force issues. I am on the adjunct faculty of Excelsior College, teaching Criminal Procedure, Management Strategies for Public Safety and a variety of other

undergraduate courses in the School of Liberal Arts, Criminal Justice Department, and teach the occasional course for the English Department. I provide law enforcement academy curriculum consulting and accreditation review services for the United States Department of Justice. I am a program and grant reviewer for the Office of Justice Programs, United States Department of Justice. I have also served as a contract consultant to the United States Department of Justice, assigned to provide technical assistance and management consulting to various public safety entities in the United States.

5.      I am a consultant to the Utah Risk Management Mutual Association, the state's largest insurer of public safety agencies, on matters of officer conduct and discipline, sufficiency of training, hiring and screening practices, use of force, and police agency policies. I am the co-founder of, and legal advisor to, a best practices advisory group charged with developing model policies and best practices under the authority of the Utah Chiefs of Police Association, the Utah Sheriffs' Association and various state law enforcement agencies. I occasionally perform in-custody death investigations and officer-involved shooting death investigations for agencies which may lack the requisite expertise. I am the author of a number of model policies for law enforcement agencies, and have provided policy drafting and policy review services for several agencies, including full policy drafting responsibility for one of the state's larger law enforcement agencies.

6.      I participate and serve in a number of community and professional capacities. I am a member of the Scientific Working Group on Dog and Orthogonal Factors, a national best practices and standards organization working on behalf of the Federal Bureau of Investigation, the United States Department of Homeland Security, and the United States Transportation Security

Administration, with research and peer review coordinated by the International Forensic Research Institute at Florida International University. Other professional activities pertinent to law enforcement include serving as a Past-President of the Utah Peace Officers Association, former Board Member of the Utah SWAT Association, member of the International Association of Law Enforcement Educators and Trainers Association, member of the International Association of Chiefs of Police and the Utah Chiefs of Police Association, member of the National Tactical Officers Association, member of the International Association of Law Enforcement Firearms Instructors, member of the International Association of Directors of Law Enforcement Standards and Training, member of the International Law Enforcement Educators and Trainers Association, and member of the United States Police Canine Association. I have served as co-Chairman or Chairman of the Utah Law Enforcement Legislative Committee for the past six years. I formerly served as a gubernatorial appointee to the Council on Peace Officer Standards and Training, under Governor Michael Leavitt.

7.      Since 1994, I have been a member of the K9 Academy for Law Enforcement consulting group and the International Police Canine Conference. My principal responsibilities are to provide use of force training, civil liability instruction, and search and seizure instruction. In the past few years, I have restricted my travel outside the State of Utah, but have continued to provide use of force, civil rights liability, and search and seizure law enforcement training in Arizona, Iowa, and California. Over the past several years, I have lectured and trained police officers and administrators from Wyoming, Arizona, Connecticut, Florida, North Carolina, South Carolina, Texas, Utah, Colorado, Alabama, Louisiana, Nevada, New York, New Hampshire,

Vermont, Rhode Island, Maine, Delaware, Wisconsin, Michigan, Indiana, Washington, Oregon, Nebraska, Georgia, California, Nevada, and Idaho.

8.      I have previously published a number of other professional articles, many of which have been subjected to peer review.  My most recent book, *Street Legal: A Guide to Pre-trial Criminal Procedure for Police, Prosecutors, and Defenders* was published in late 2007 by the American Bar Association Publishing Division.  It is a treatise on public safety and criminal procedure.  My other published works include: *Acknowledging Gender in Fitness Standards for Police: An Invitation to Liability?*, The Municipal Lawyer, January 2008; *K9 Court Testimony*, Police K9, December 2006; *United States Supreme Court Review for Corrections Managers*, Corrections Managers Report, October 2006; *Criminal Procedure: The Street Cop's Guide* (Aspen Press 2005); *Conduct Unbecoming an Officer*, The Municipal Lawyer, January, 2005; *Limits on Off-Duty Police Employment*, The Municipal Lawyer, Spring 2004; *Conjugal Prison Visits*, Corrections Manager, March, 2003; *Life in the Law* (BYU Press 2002), co-author; *Investigating In-Custody Death*, Corrections Manager Report, October 2002; *Police Canine Risk Management*, The Municipal Lawyer, July 2002; *The New Paradigm of Firearms Training*, IADLEST News, Spring 2001; *Use of Deadly Force Instructor Curriculum* (monograph), POST, Spring 2001; *Pepper Spray as Use of Force*, Police, October 2000; *Are Drug Courts the Wave of the Future?*, Police, April 2000; *Legal Risks of Tactical Operation*, Police, April 1999; *Dogs of War (K9 Use of Force)/FLSA & K9 Handlers*, Police, December 1998/January 1999; *No-knock & Nighttime Searches*, Police, September 1998; *The Respectable Roadblock Ruse*, Police, June 1998; *If at First You Don't Succeed . . .*, Clark Memorandum, Fall 1998; *Preparing and Executing Search Warrants* (UPOA 1998); *Taking a Real Bite Out of Crime: Successful Risk*

*Management for K9 Programs*, Utah Peace Officer, Summer 1996; *Lobbying, PACs and Campaign Finance* (West Publishing 1994), co-author; *Heeding the Call: Search and Seizure Jurisprudence Under Article I, Section 14, of the Utah Constitution*, 17 Utah Journal of Contemporary Law 267 (1991); *RICO & the Prime: Taking a Bite out of Crime?*, 2 Utah Bar Journal 7 (1991); *Margaret Bush Wilson and Shelley v. Kraemer*, 4 B.Y.U. J. Pub. Law 207 (1990); *Wilderness Water Rights: The Status of Reserved Rights After the Tarr Opinion*, 4 B.Y.U. J. Pub. Law 357 (1989); *Negligent Hiring: The Dual Sting of Pre-Employment Investigation*, 8 Utah B.J. 15 (1989), and a variety of columns addressing law enforcement issues and published by PoliceOne.com. I am the author of a reference book currently in use in the Utah Law Enforcement Academy, as well as other police academies throughout the United States, titled *Criminal Procedure: The Street Cop's Guide* (Aspen Press 2005).

9.    I infrequently serve as an expert witness and I charge a fee for private consultation services and court testimony. For those matters which progress beyond an initial brief consultation, I charge $150.00 per hour for all activities outside of court testimony, a travel fee of $500.00 per day, plus actual expenses, for travel to western states and $1,000.00 per day for all other states, and $250.00 per hour when offering testimony. I have testified and/or provided depositions in the following cases which are generally related to the subject of the instant litigation in the past four years: *Nielson v. South Salt Lake City & Burnham*, Case No. 2:06-CV-335, United States District Court of Utah, Central Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: sexual misconduct; *Trammell v. Jacksonville Beach City Police Department*, Case No. 3:06-CV-984-J-16MMH, United States District Court of Florida, Jacksonville Division, 2008. Deposition testimony given on behalf of the plaintiffs.

Subject matter: excessive force; *Harman & Overton v. Utah Department of Public Safety,* Case No. 2:03CV00558TC, United States District Court of Utah, Central Division, 2007. Deposition testimony given on behalf of the defendants. Subject matter: wrongful execution of a search warrant, negligent investigation; *Herring v. City of Colorado Springs*, Civil No. 04-CV-024229-PAC-BNB, United States District Court of Colorado, 2005. Deposition testimony given on behalf of the defendants. Subject matter: excessive use of force, wrongful death; *Walker v. Orem Department of Public Safety*, Case No. 2:02-CV-0253, United States District Court of Utah, Central Division, 2004. Deposition testimony given on behalf of the defendants. Subject matter: excessive use of force, wrongful death. This list is accurate for dates between June 10, 2004, and June 10, 2008.

10.     In the instant matter, I have relied upon the documents, photographs, video recording, pleadings, records, reports, depositions, and statements previously described. I have formed a number of opinions based upon the aforementioned, as well as my experience, education, and familiarity with professional publications. I have relied on a variety of professional publications, as well as my own publications and court decisions cited therein. Those opinions, and a summary of the circumstances known or reported to me upon which those opinions are based, are set forth herein as follows:

a.      Summary of reported facts and conclusions:

1.      On Monday, December 18, 2008, the Weber County Dispatch Center received multiple calls reporting a man with a gun and a man shooting a gun in the area of Jefferson Avenue and 35th Street in Ogden. Jose Castillo was the primary caller. He reported that a man later identified as Jesse Turnbow ("Turnbow") was

involved in some type of disturbance and was walking down the street firing a gun. Jose Castillo was emotionally aroused by his encounter with Turnbow and dispatchers has significant difficulty obtaining clear information about Turnbow and his behavior. Apparent large caliber gunshots can be heard in the background of the dispatch recordings provided to me. A number of shots, likely four, were fired prior to police arriving in the area.

2.    Ogden City Police Department Officer Ed Mahon ("Mahon") was the first officer who responded to the report of a man with a gun. He was in the general vicinity, responding to another call for police service. As Mahon arrived, he saw that Turnbow had a concealed shotgun that he was drawing to a firing position. Turnbow moved to a tree to take cover, apparently intending to fire on Mahon from the very onset of the encounter. Mahon stood next to his police car with a drawn pistol and commanded Turnbow to put down his firearm. Turnbow immediately shot at Mahon, striking the front of Mahon's car. Mahon returned fire and sought a position of greater cover at the rear of the car. As Mahon moved, Turnbow assumed a cover position behind a large tree and he continued to shoot at Mahon. Turnbow reloaded the shotgun one or more times. Mahon returned fire, apparently striking Turnbow. Turnbow fell or sat down.

3.    Ogden City Police Department Officer John Sattelmair ("Sattelmair") was the second officer to arrive at the scene. Sattelmair saw Turnbow in a seated position. Both Sattelmair and Mahon shouted at Turnbow, telling him several times to drop

the shotgun. Turnbow aimed the shotgun at Sattelmair and Mahon and Sattelmair fired at Turnbow.

4.      Within a second or two of Sattelmair's arrival at the scene, Ogden City Police Department Officer Derek Draper ("Draper") arrived at the scene. Almost immediately after his arrival, Draper saw Turnbow aim the shotgun at Mahon and Sattelmair. Draper, Sattelmair and Mahon responded by firing at Turnbow. Turnbow ended up in a supine position, still holding the gun.

5.      Recognizing that Turnbow could still pose a threat, Mahon prompted Draper to try to secure Turnbow's shotgun. Draper cautiously approached Turnbow to move the shotgun away from him. Though wounded, Turnbow suddenly raised up the shotgun and aimed it at Sattelmair and Mahon as Draper approached him. The three officers fired upon Turnbow and he dropped the shotgun.

6.      Turnbow was apparently incapacitated and Draper removed the shotgun from his reach. Turnbow died at the scene.

b.      Ogden City Police Department Policy Number 03, Use of Force (the "policy" or "use of force policy"), meets or exceeds constitutional standards governing use of force by police clearly established by the United States Supreme Court and the policy meets or exceeds statutory standards governing use of force by police established by the Utah State Legislature.

c.      The Ogden City Police Department use of force policy is founded upon constitutional principles articulated in Utah Code Ann. § 76-2-404 (which is cited therein in its entirety), *Graham v. Conner*, 490 U.S. 386 (1989) and *Sacramento v. Lewis*, 523 U.S. 833 (1998).

The Ogden City Police Department's policy is to "use only that force which is reasonably necessary to effectively bring a situation under control while protecting the life of the officer or another." The policy provides that deadly force may be used when reasonably necessary and when:

> "effecting an arrest . . . where the officer reasonably believes that deadly force is necessary to prevent the arrest from being defeated by escape; and [where] the officer has probable cause to believe that the suspect has committed a felony offense involving the infliction or threatened infliction of death or serious bodily injury; or the officer has probable cause to believe the suspect poses a threat of death or serious bodily injury to the officer or to others if apprehension is delayed; or the officer reasonably believes that the use of deadly force is necessary to prevent death or serious bodily injury to the officer or another person. If feasible, a verbal warning should be given by the officer prior to any use of deadly force . . . ."

(Citing Utah Code Ann. § 76-2-404). This standard fully incorporates the three-part test prescribed in *Graham v. Connor*. The *Graham* standard is taught at the Utah Police Academy as part of the core use of force curriculum. Officers must evaluate force considering: first, the severity of the offense committed by the suspect; second, whether the suspect is actively resisting arrest or attempting to escape; and third, whether the suspect poses an immediate threat to the officer or others. *Graham v. Conner*, 490 U.S. 386, 396 (1989).

d.    The Ogden City Police use of force policy not only includes the standard by which an officer can readily determine the propriety of the use of force, and more particularly deadly force, but also includes other factors commonly found in model policies or best practices statements governing police use of force.  For example, the policy includes a procedure for conducting timely and comprehensive investigations of uses of force and provides that the investigations shall be conducted by command staff, training supervisory staff, and major crimes investigators.  The incumbents in these positions are generally best suited to properly investigate and evaluate the use of police force.  The policy requires review of serious incidents of use of force by the Chief of Police.  The policy appears to be subject to regular review.  Officers receive mandatory annual training on the use of force policy.  The policy prescribes the authorized weapons and ammunition and prescribes conditions under which an officer may carry a weapon when off-duty or traveling.  The policy addresses the inadvisability of warning shots.  The policy requires mandatory review of any firearms discharge, and supervisory and administrative review of all critical incidents.  The policy sets clear definitions so that the policy may be clearly understood..

e.    I have previously had occasion to compare the accreditation best practices standards specifically relating to use of force as promulgated by numerous state and national accreditation agencies.  The aforementioned features of the Ogden City Police use of force policy that govern when force can lawfully be used meet or exceed best practice standards as prescribed by a number of law enforcement accreditation authorities, including, but not limited to, the Utah Chiefs of Police Association.

f.      One of the prescribed procedures contained in the use of force policy provides that an officer should "remove a suspect's ability to endanger the lives of persons, once the suspect has exhibited an intent to do so."  An officer should "fire at the center mass of the suspect and continue to fire until the suspect's ability to endanger life has been neutralized."  This provision recognizes that the purpose of using deadly force is to preserve lives when faced with illegal, imminent threats of deadly force by criminal suspects.  It is consistent with constitutional principles and reasonable police practices in the State of Utah and throughout the nation.

g.      The use of force, more particularly the discharge of firearms upon Turnbow by Mahon, Sattelmair and Draper, complied with constitutional standards governing use of force by police clearly established by the United States Supreme Court.

h.      The use of force, more particularly the discharge of firearms upon Turnbow by Mahon, complied with statutory standards governing use of force by police established by the Utah State Legislature and contained in Utah Code Ann. § 76-2-404.

i.      The use of force, more particularly the discharge of firearms upon Turnbow by Sattelmair and Draper, complied with the Ogden City Police Department use of force policy and procedures.

j.      The use of force, more particularly the discharge of firearms upon Turnbow by Mahon, Sattelmair and Draper, complied with training provided by Utah Peace Officer Standards and Training and the Ogden City Police Department.

k.   The use of force, more particularly the discharge of firearms upon Turnbow by Mahon, Sattelmair and Draper, complied with generally accepted police practices in use in the State of Utah and throughout the United States.

l.   As Mahon approached the corner of 35th Street and Jefferson Avenue, he saw a male that matched the description provided by the callers who had complained about a man shooting a gun in the neighborhood.  Mahon had been told by dispatch that shots had been fired, so he reasonably believed that the male was armed with a functional weapon and was presently capable and willing of firing the weapon.  This male was later identified as Turnbow.  From a distance of approximately one hundred feet, Mahon saw that Turnbow was drawing a large firearm from inside his clothing.  Mahon stopped his clearly marked police car and drew his pistol as he got out of the car.  He shouted a verbal warning to Turnbow to drop the shotgun.  Turnbow responded by firing directly at Mahon and his car, striking the car.  Mahon returned fire in an effort to defend himself.

m.   Mahon reasonably believed that Turnbow was committing a felony involving the infliction or threatened infliction of death or serious bodily injury.  Turnbow was committing an aggravated assault on Mahon, at the very least, or potentially and probably attempting to unlawfully kill Mahon.  Mahon also had probable cause to believe that Turnbow posed a threat of death or serious bodily injury to Mahon or to others if Turnbow was not promptly apprehended.  Turnbow was firing a weapon certainly known for its lethality and was aiming at Mahon as evidenced by the pellets that struck the car window where Mahon had been seated only seconds or less prior to impact.  Mahon reasonably believed that the use of deadly force was necessary to prevent his own death or serious bodily injury and

potentially death or serious bodily injury to others. Turnbow responded to Mahon's repeated verbal warnings and commands to drop the shotgun by taking a position of offensive cover and firing upon Mahon. Mahon responded to Turnbow's unlawful assault by firing and repeating his commands. Turnbow sustained his shotgun fire directly at Mahon, "continually shooting." Turnbow reloaded the shotgun, demonstrating that he did not intend to comply with Mahon's warnings and commands; instead, he intended to continue his assault. OC00040-44; Mahon depo. pp. 87-92; 97-102. In each instant that Mahon fired upon Turnbow, no other course of action would have been reasonable and prudent under the circumstances.

n.    After Turnbow's initial assault on Mahon and Mahon's initial defensive shots, Sattelmair arrived at the scene. While en route, Sattelmair heard the exchange of gun fire between Mahon and Turnbow. Upon his arrival, Sattelmair initially perceived that Turnbow's assault was ended. He approached Turnbow with his pistol drawn, but did not fire it. Then he saw that Turnbow was sitting up and was still holding a shotgun and he retreated to the cover of his patrol car. Sattelmair heard Mahon command Turnbow to drop the shotgun and Sattelmair shouted similar warnings. Sattelmair saw Turnbow raise up the shotgun. Sattelmair fired upon Turnbow. Turnbow fell supine. Mahon, Sattelmair and Draper communicated and Draper began to move toward Turnbow to seize the shotgun. As Draper neared Turnbow, Turnbow again grasped the shotgun and began to move it up again as if to resume firing. Sattelmair responded by again firing at Turnbow. OC00059, 61-62; Sattelmair depo. pp. 52-53.

o.    At each moment when Sattelmair fired his pistol at Turnbow, he reasonably believed that

Turnbow had committed and was continuing to commit a felony involving the infliction or

threatened infliction of death or serious bodily injury.  Turnbow had committed an

aggravated assault or attempted criminal homicide on Mahon and appeared to be about to

repeat his assault or attempted criminal homicide on Mahon or other officers, including

Sattelmair.  Sattelmair also had probable cause to believe that Turnbow posed a threat of

death or serious bodily injury to Sattelmair and/or to if Turnbow was not promptly

apprehended.  Turnbow was firing a deadly weapon and had shown his criminal intent in

firing at Mahon.  The evidence of the assault, Mahon's damaged patrol car and the ejected

spent shotgun shells, was apparent to Sattelmair.  OC00059.  Sattelmair reasonably

believed that the use of deadly force was necessary to prevent his own death or serious

bodily injury and potentially death or serious bodily injury to others.  In neither instant that

Sattelmair fired upon Turnbow would it have been reasonable or prudent to use any lesser

force.  Sattelmair contined to fire "because the threat didn't stop."  Sattlemair depo. p. 57.

p.    Almost simultaneously to Sattelmair, Draper arrived at the scene.  Prior to stopping,

Draper saw and heard Turnbow shoot at Mahon and strike Mahon's patrol car.  As

Draper got out of his patrol car, he could see that Turnbow sitting or leaning against the

tree and still holding the shotgun.  Draper immediately began to shout warnings and

commands at Turnbow to drop the gun.  As Draper approached Turnbow, Turnbow

raised up the shotgun and aimed it at Mahon and Sattelmair.  Draper fired upon Turnbow.

Turnbow dropped the shotgun.  Turnbow then reached out and grasped the shotgun,

beginning to point it again at Mahon and Sattelmair. Draper fired a second time. OC00048-49, 53-54; Draper depo. pp. 87, 91.

q.     At each of the two moments that Draper fired his pistol at Turnbow, he reasonably believed that Turnbow had committed and was continuing to commit a felony involving the infliction or threatened infliction of death or serious bodily injury. Turnbow had committed an aggravated assault or attempted criminal homicide on Mahon and Draper reasonably perceived that Turnbow appeared to be about to repeat his assault or attempted criminal homicide on Mahon and Sattelmair. Draper had probable cause to believe that Turnbow posed a threat of death or serious bodily injury to Mahon and Sattelmair and potentially (if he had turned) to Draper if Turnbow was not promptly apprehended. Turnbow was firing a deadly weapon and had shown his criminal intent in firing at Mahon and repeatedly pointing the shotgun at Mahon and Sattelmair. Draper saw the assault on Mahon and saw the projectiles strike Mahon's patrol car. Draper reasonably believed that the use of deadly force was necessary to prevent his own death or serious bodily injury and potentially death or serious bodily injury to others. In neither instant that Draper fired upon Turnbow would it have been reasonable or prudent to use any lesser force.

r.     At each moment that the officers fired at Turnbow, their individual and collective actions were reasonable and comported with reasonable police practices and training. Each officer was faced with a tense, uncertain, and rapidly evolving situation initiated by Turnbow. Mahon, Sattelmair and Draper are each obligated to independently respond to

Turnbow's action based on their individual assessment of the threat that he posed. It is evident that each of the three did just that. There is no evidence of contagious fire.

s.      All of the evidence presented to me shows that Mahon, Sattelmair and Draper arrived at their well-founded and reasonable beliefs that Turnbow was acting feloniously, intending to cause death and/or serious bodily injury to the officers or others, and that neutralizing his threat of continued deadly force was paramount. The officers' perceptions were based on objective facts, including reports of Turnbow wantonly firing in a residential neighborhood where he knew young children to be present, Turnbow's initial firing upon Mahon, Turnbow's repeated shooting at the officers, Turnbow's body position poised to fire on the officers, Turnbow's apparent firm decision to retain his deadly shotgun and to continue his assault while wounded, Turnbow's reloading, Turnbow's use of offensive cover, and perhaps even Turnbow's statements.

t.      Each instance of firing by the individual officers, recognizing that there were three closely-timed, yet distinct, instances, followed a distinct deliberate act by Turnbow that justified the use of deadly force by the officers. Each time each officer fired, it is clear that the individual officer was firing to neutralize Turnbow's use of deadly force as he fired upon Mahon and raised up the shotgun to fire at Mahon and Sattelmair. The officers each continued to assess Turnbow's actions and stopped firing upon Turnbow when he did not present an imminent threat to the officers. The officers each assessed Turnbow's interruptions in his assault and the officers did not resume firing until Turnbow once again presented an imminent threat of death or serious bodily injury to the officers or others. At the point that the officers assessed that Turnbow no longer could or would continue his

felonious actions, each officer ceased his defensive fire. The officers each demonstrated the capacity to fire and assess while facing an active shooter armed with a fearsome weapon.

u.   Mahon, Sattelmair and Draper acted with the intent to stop Turnbow's illegal assaultive actions. The evidence demonstrates that their singular purpose was to stop Turnbow. They each attempted –repeatedly– to warn Turnbow to drop his shotgun. The officers' conduct was an attempt to effect a lawful objective. No evidence suggests any improper purpose or purpose to harm Turnbow.

v.   The Ogden City Police Department, and virtually all of Utah's 29 sheriff's offices and nearly 150 police departments and state law enforcement agencies, rely on the Utah Police Academy or one of its satellite academies to provide the basic police training course spanning several months. The Ogden City Police Department provides its own in-service training and also relies on outside sources for additional in-service training. Police officers must complete 40 hours of in-service training each year in a variety of subjects determined by the discretion of the law enforcement agency.

w.   Review of Mahon's training records shows that he received in excess of the prescribed 40 hours for the years preceding this incident.

x.   Review of Sattelmair's training records shows that he received in excess of the prescribed 40 hours for the years preceding this incident.

y.   Review of Draper's training records shows that he received in excess of the prescribed 40 hours for the years preceding this incident.

z.      The Ogden City Police Department provided firearms training that incorporates current practices in law enforcement firearms training, including lateral, advance and retreat movement and shoot-on-the-move drills. Draper depo. pp. 41, 94. Moreover, the Ogden City Police Department provided dynamic, scenario-based realistic decision-making shooting training at least once each year. The Ogden City Police Department also provided low-light firearms training. OC00514-519; 522-24; 526-528. This training reflects the operational conditions that a municipal police officer may reasonably expect to face in duty situations. Mahon, Sattelmair and Draper each participated in these training courses. Officers also participate in training and discussion of the use of force policy. Mahon depo. pp. 64-65.

aa.     The Ogden City Police Department also afforded officers the opportunity to receive training in a number of force options beside firearms. Sattelmair was trained in the use of less-lethal projectiles, operation of the Taser X-26 electromuscular disruption device, arrest control and defensive tactics, and use of the ASP expandable baton. Additionally, Sattelmair was qualified as a defensive tactics instructor, and a Taser electromuscular disruption device instructor.

bb.     Mahon was trained in the use of the Taser X-26 electromuscular disruption device, oleoresin capsicum aerosols, arrest control and defensive tactics, and use of the ASP expandable baton. Mahon was also trained as a police service dog handler. The extensive Utah POST Academy training to qualify as a police service dog handler includes a substantial component of constitutional limitations on use of force.

cc.     Draper was trained in the use of the Taser X-26 electromuscular disruption device, oleoresin capsicum aerosols, arrest control and defensive tactics, and use of the ASP expandable baton.  Additionally, Draper was qualified as a defensive tactics instructor, a baton instructor, and a Taser electromuscular disruption device instructor.

dd.     In Utah, instructor training for defensive tactics, baton and use of the Taser electromuscular disruption device requires not only demonstration of a high degree of proficiency, but also an objective testing procedure to ensure that only those who are actually skilled may teach other officers.  The fact that Mahon and Draper were both qualified as instructors in multiple disciplines demonstrates that these officers were professionally trained and accomplished substantially above the level of an average officer.

ee.     The variety of force options training offered by the Ogden City Police Department, and completed by Mahon, Sattelmair and Draper, demonstrates the Ogden City Police Department's commitment to training its officers well, exceeding requirements prescribed by the State of Utah Peace Officer Standards and Training.  Moreover, the breadth of force options training provided by the Ogden City Police Department reflects an conscious awareness of, and desire to train officers in, less-lethal and non-lethal force options.

ff.     A number of intermediate force options and force tools and proper training to use those tools were provided to Mahon, Sattelmair and Draper.  Though Turnbow's spontaneous, sudden and sustained assault with a shotgun made it unreasonable to use any force less than deadly force, the Ogden City Police Department has clearly contemplated that many dynamic encounters with criminal suspects may be resolved with a lesser degree of force.  Obviously, any officer would hope to never be required to use deadly force.  Nonetheless,

the Ogden City Police Department has provided the tools and training that comport with the best practices currently in use in law enforcement agencies throughout the State of Utah and the United States.

gg.      The Ogden City Police Department requires successful completion of an annual fitness test as a condition of continued employment. Many contemporary police administrators and researchers recognize that physically fit officers are less prone to injure themselves and less prone to use unnecessary physical force in subduing criminal suspects. The City's commitment to physical fitness of its officers shows an exemplary commitment to reduce the necessity for force and to exceed minimum thresholds for police training.

These observations and opinions are preliminary, insofar as additional information may be provided to me through the course of discovery and other incidents of the litigation process. They are based on the best information presently known to me. I have assumed the general accuracy of the documents, statements, depositions, and reports, excepting those expressed as opinions and those conflicting one with another, that were provided to me. The opinions herein may be supplemented and/or revised upon receipt of additional information, including, but not limited to, further deposition testimony or corrections to reported depositions, consideration of any further report submitted by plaintiff's expert or experts, and further investigation. I anticipate the possibility of supplementing this report upon completion of further depositions of witnesses in this matter and/or upon being provided with other documents, data and/or images.

My trial testimony may be supported by exhibits that include the pleadings, documents, statements, depositions, videotape, diagrams, photographs, and reports listed herein, as well as illustrative evidence such as a visual presentation of computer-generated slides and visual images

projected onto a screen charts, graphs, or illustrations created to better illustrate the aforementioned testimony.

## CONCLUSION

The use of force was reasonable and appropriate due to Turnbow's continued deadly assaultive actions against the police officers. The use of deadly force under these circumstances did not constitute excessive force. The Ogden City Police use of force policy comports with constitutional and statutory provisions and reflects current best practices among regional and national law enforcement agencies. Officers Mahon, Sattelmair and Draper were provided with reasonable and adequate training and their training exceeds applicable standards.

Kenneth R. Wallentine
June 11, 2008

Kenneth R. Wallentine
5272 South College Drive, Suite 200
Murray, Utah 84123