```
              IN THE UNITED STATES DISTRICT COURT

               STATE OF UTAH, NORTHERN DIVISION

                          * * *

THE ESTATE OF JESSE        )
TURNBOW and JACINDA        )
SCRUGGS,                   )
                           ) Civil No. 1:07CV114
        Plaintiffs,        )
                           ) Deposition of:
    vs.                    )
                           ) KENNETH WALLENTINE
OGDEN CITY, OFFICER ED     )
MAHON, OFFICER JOHN        )
SATTELMAIR, OFFICER        )
DEREK DRAPER, and JOHN     )
DOES 1-20,                 )
                           )
        Defendants.        )

                          * * *


               August 12, 2008
                 1:35 p.m.


    Law Offices of Snow, Christensen & Martineau
         10 Exchange Place, 11th Floor
              Salt Lake City, Utah

                          * * *
```

Shelly Wadsworth

- Certified Realtime Reporter -

Registered Professional Reporter

2c2c4ff8-22c1-4b72-b236-d95bb05aa6b8

 Q. So Salt Lake City, the chief of police, can say, "I want my officers to have, I don't know, 20 hours a year of live fire training, if you will, going out and weapons qualification," and Beaver can say, "Nah, we only need one hour"? There's no standardized requirement; am I understanding that right?

 A. There is currently in the state of Utah a standard requirement for inservice training generally. There is not a substandard or a subset of that standard that governs the number of hours that must be directed to firearms training.

 Q. I believe the hours are -- does 40 sound about right?

 A. That is correct.

 Q. And those are the inservice hours?

 A. Yes, sir.

 Q. Inservice is decided by the local chief of police or the local -- I guess let's just say chief of police or the local head law enforcement official of the department?

 MS. WHITE: Objection, calls for speculation.

 Q. Do you know?

 A. I know what the rule was three years ago.

1  officers protection from somebody shooting them,
2  right?
3     A.   One would hope.
4     Q.   When an officer that you're training -- do
5  you train at the POST, at the academy?
6     A.   I do.
7     Q.   When you're training an officer in that
8  situation on the use of firearms, what are they
9  trained?  Do they actually have to engage their
10 service weapon or is it shoot as many times?  What
11 is the training you give the officer?
12    A.   I'm afraid that question is way too broad
13 for me to give you an answer.
14    Q.   When you train an officer, you're training
15 them on the proper use of their firearm, right?
16    A.   Yes.
17    Q.   What does that training entail, then?
18 What are they trained to do?  If a subject is
19 engaging them, what is that officer supposed to do?
20 And "engage" I mean with a weapon.
21    A.   Are you asking what is an officer supposed
22 to do if somebody is shooting at that officer?
23    Q.   Yeah.
24    A.   The officer is supposed to neutralize the
25 threat in the best fashion possible.  If there are

¹ other alternatives, cover alternatives, then it
² would be best for the officer to take cover if
³ indeed such alternatives exist.
⁴     Q.    Are you familiar with the term "double
⁵ tap" as it relates to officers using their weapons?
⁶     A.    I am.
⁷     Q.    What does that mean, in your mind's eye?
⁸     A.    "Double tap" as a term is commonly used by
⁹ firearms instructors to refer to firing two rounds
¹⁰ in rapid succession at the same location.
¹¹     Q.    And where on a target, let's say a human
¹² target, where is the officer trained to fire in that
¹³ double tap?
¹⁴     A.    If all options are available, generally
¹⁵ training concentrates on firing to the center of
¹⁶ mass of the human body.
¹⁷     Q.    Which would be the torso area?
¹⁸     A.    Yes.
¹⁹     Q.    And as a firearms instructor, are you
²⁰ teaching your officers to use a double tap technique
²¹ in the unfortunate event they have to actually
²² engage or return fire?
²³     A.    It is one of the techniques that is
²⁴ commonly taught at the police academy.  And I teach
²⁵ it.

1  Q.   After that double tap situation, what is
2  the officer trained they're supposed to do?
3  A.   Well, that depends largely on the
4  response.  The officer is trained to continually
5  assess the necessity for continued deadly force.  If
6  after a double tap the rounds have been effective in
7  stopping hostile fire, then the officer would cease
8  defensive fire.
9  Q.   What if the threat still is not completely
10 neutralized?  What is the next step?  They've double
11 tapped, they've assessed and the threat is still not
12 neutralized.  As a firearms instructor, what are you
13 training these officers to do?
14 A.   I'm not sure I understand what you mean by
15 "still not completely neutralized."
16 Q.   You mentioned the fact they are trained to
17 double tap -- let me paraphrase -- double tap in the
18 goal of neutralizing the threat.
19 A.   Yes.
20 Q.   And then they would assess that situation
21 because they're constantly assessing.
22 A.   Yes.  Are you asking me what would the
23 officer be trained to do if the threat of deadly
24 force persists?
25 Q.   Yeah.

1    A.   If the threat of deadly force persists,
2  then the officer is still in a situation where it's
3  advisable to fire defensive rounds.  The officer
4  should continue to fire defensive rounds.
5    Q.   When officers have to engage and there's
6  multiple officers on the scene, what's the policy?
7  What do you, as a firearms instructor, train your
8  officers to do if multiple officers are there and
9  the use of deadly force has to occur?
10    A.   There are so many variances to that
11  scenario.  I can't give you anything but the most
12  grossly generalized answer.
13    Q.   Let's start with the most grossly
14  generalized answer.
15    A.   Each officer would be responsible to make
16  an independent assessment as to the propriety of
17  that officer using deadly force to terminate
18  aggressive deadly force against that individual
19  officer, another innocent party, including but not
20  limited to another police officer.
21    Q.   So in that general situation, a
22  multiple-officer instance, nobody is trained to like
23  take the lead and direct traffic, I guess, if you
24  will?  I guess direct traffic is a bad phrase, but
25  kind of take the lead on what's going on.

Shelly Wadsworth, RPR/CRR
DepomaxMerit

2c2c4ff8-22c1-4b72-b236-d95bb05aa6b8

1  A. Yes.

2  Q. So you would add those to the report as
3  depositions that you considered and reviewed?

4  A. I did. I think what happened is I wrote
5  this paragraph and then you gave me a packet of a
6  bunch of short depositions all in one package and I
7  didn't go back.

8  Q. That's great. And then one last thing I
9  wanted to just go over with you is training on
10 officers with double tapping. You talked about that
11 a little bit with Mr. Studebaker. I'd like to
12 discuss a little bit how they're trained. Are
13 officers trained that they have to or that they
14 double tap and then have to stop and assess a
15 threat? Is it something that they do in a
16 continuous nature? Would you explain that?

17 A. Sure. But first I want to clarify. And I
18 told Mr. Studebaker this. Double tap is about one
19 technique. I don't know whether this is critical to
20 you or not, but it's important to me to explain to
21 you that there are other times when you may want to
22 continue to deliver fire and you don't think double
23 tap. There are times we train officers to fire one
24 round. But in any delivery of rounds in any
25 shooting, the officers are taught, as I mentioned

before, to continually assess the need for deadly force. Each officer who pulls the trigger each time is responsible for that round that's being delivered. And so there's a constant assessment. But your question that you've just asked me in terms of stop and assess is not consistent with law enforcement training anywhere that I'm aware of.

Q. And based on the training that you provide to officers, did you reach a conclusion about whether the officers in this case responded appropriately with fire?

A. I did.

Q. And what was that?

A. My conclusion was that each one of these individual officers -- Draper, Mahon and Sattelmair -- were each using deadly force consistent with the training that we deliver at the police academy here in the State of Utah.

Q. And is that training to continue to fire until a threat is neutralized?

A. That training is to continue to fire until a person is neutralized or, in other words, until the aggressive force no longer presents a threat of death or serious bodily injury to an officer or to an innocent third party, including but not limited