IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| THE ESTATE OF JESSE TURNBOW and JACINDA SCRUGGS, Plaintiffs, vs. OGDEN CITY, OFFICER ED MAHON, OFFICER JOHN SATTELMAIR, OFFICER DEREK DRAPER, and JOHN DOES 1-20, Defendants. | ORDER AND MEMORANDUM DECISION Case No. 1:07-CV-114TC |

On December 18, 2008, Jesse Turnbow died during a shootout with officers of the Ogden City Police Department. The Plaintiffs, Jacinda Scruggs and the Estate of Jesse Turnbow, have now filed this 42 U.S.C. § 1983 action against the officers involved and Ogden City. Plaintiffs claim that the officers used excessive force in violation of Mr. Turnbow's constitutional rights.[1] Plaintiffs contend that Ogden City is liable because it knew that one of the officers had a history of using excessive force on the job. Plaintiffs have also brought state law claims for negligence and intentional infliction of emotional distress.

The officers deny that they violated Mr. Turnbow's civil rights and, in any event, maintain that they are entitled to qualified immunity. Finally, Ogden City denies the charges,

---

[1] Ms. Scruggs also brought this suit in her personal capacity. She has since acknowledged that she has standing only as the representative of Mr. Turnbow's estate.

arguing that Plaintiffs have offered no admissible evidence of excessive force by its officer. The Defendants also contend that the state-law claims are barred by Utah's Governmental Immunity Act of Utah.

Because the evidence demonstrates the officers reasonably could have believed Mr. Turnbow posed a threat at the time they fired on him, Mr. Turnbow's constitutional rights were not violated. Accordingly, the officers and Ogden City are entitled to summary judgment on Plaintiffs' constitutional claims. The court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.

## **Background**

The events which lead to Mr. Turnbow's death can be divided into three phases, roughly corresponding to three separate rounds of gunfire. The parties basically agree on what happened during phases one and two (although their versions of events during phase two differ slightly, the differences are immaterial). The real dispute centers on the final phase of the incident, phase three, which ended with Mr. Turnbow's death.

Phase One

Shortly before 6 p.m. on December 18, 2006, Defendant Ed Mahon of the Ogden City Police Department received a report of a man (later identified as Mr. Turnbow) firing a shotgun in a residential area of the city. As he drove towards the area, Officer Mahon saw a man (Mr. Turnbow) matching the suspect's description walking towards an intersection. Officer Mahon stopped and got out of the patrol car. When Mr. Turnbow saw Officer Mahon, he pulled a sawed-off shotgun from under his coat and took cover behind a small tree. Officer Mahon radioed dispatch and told the dispatcher that he had the suspect at gunpoint. He yelled at Mr.

Turnbow to drop the gun; in response, Mr. Turnbow fired at Officer Mahon.  Officer Mahon again shouted at Mr. Turnbow to drop the gun and  fired back.  Officer Mahon took cover behind his patrol car.  Mr. Turnbow did not drop his shotgun and the two men continued shooting.

Phase Two

After being shot somewhere in his hip or buttocks, Mr. Turnbow came out from behind the tree.  Once again Officer Mahon told Mr. Turnbow to drop the gun but instead, Mr. Turnbow shot at him and Officer Mahon returned the fire.  Then, as Officer Mahon described in his deposition,  Mr. Turnbow  fell "to the ground backward and to the right.  The shotgun falls right down on his lap, and he kind of leans back and he's leaning back slightly."  (Defs.' Mem. Supp. Summ. J., Ex. 1, Mahon Dep. 103:2-4, March 24, 2008)

At about this time, two other Ogden City officers arrived, Defendants John Sattelmair and Derek Draper.  Officer Sattelmair got out of his car and went towards Mr. Turnbow.  Officer Draper  was approaching Mr. Turnbow from another angle; Officer Draper fired as he approached.  During the encounter Mr. Turnbow yelled at the officers to shoot him.

Phase Three

    a. Defendants' Evidence

        1. The Officers' testimony

Officer Mahon testified that at that point, Mr. Turnbow grabbed the gun from his lap and tried to point it at the officers.  Officer Mahon fired at Mr. Turnbow and Mr. Turnbow fell to his side.  Officer Mahon told Officer Draper to get the shogun while the other officers provided cover.  As Officer Draper approached, Mr. Turnbow started to get up, raising the gun at Officers Mahon and Sattelmair.  The officers fired at Mr. Turnbow until he fell back.  The officers took

the shotgun from Mr. Turnbow, placed handcuffs on him and called for the paramedics.  Mr. Turnbow died at the scene.  Later it was determined that the officers had shot Mr. Turnbow approximately twenty-one times.

### 2. Eyewitness testimony

In addition to the officers, approximately fourteen people saw the shooting.  Defendants have separated these witnesses into two categories: eyewitnesses who agree with the officers that Mr. Turnbow was pointing the shotgun at the officers when they shot him during the final phase and those "who were confused and/or had only limited ability to perceive but who nonetheless do not directly contradict the officers." (Defs.' Mem. Supp. Summ. J. at x n.3)  Eric Roberts and Larry Wade are two of the eyewitnesses who fall into the first category.  (Id. at xi-xii).  Mr. Roberts testified that he saw a person on the ground lift a shotgun, point it at the officers "and that's when I heard further police shots." (Id. Ex. 16, Roberts Dep. 12:17-13:7, May 1, 2008)  In his testimony, Mr. Wade described Mr. Turnbow as holding the shotgun as if he were going to fire.  (Id. Ex. 17, Wade Dep. 42:24-44:21, May 1, 2008)

### b. Plaintiffs' Evidence

Although Plaintiffs set forth several pages of "Disputed Facts," most of these facts are not relevant.  The court will discuss those that are.

### 1. Eyewitness testimony

Plaintiffs rely on the eyewitnesses who Defendants contend fall into the second category of eyewitnesses, that is,  witnesses who were confused or had limited ability to see. But according to Plaintiffs, these witnesses were neither confused nor limited in their ability to see. Plaintiffs argue that the testimony of these witnesses shows that Mr. Turnbow was not pointing

the shotgun at the officers and did not present a threat to the officers at the time the last shots were fired. Plaintiffs point to the deposition of the following witnesses:

Liza Lopez

Soon after the shooting, Ms. Lopez gave a sworn statement in which she said that she saw Mr. Turnbow "shooting at everything, cars and police." (Lopez Dep. May 9, 2008, Ex. 2 Statement of Liza Rachelle Lopez) But later, in her deposition, she testified that when the shooting began, she ran into the house to protect her children and stayed there until the shooting was over. (Lopez Dep. 16:7-19:10)

Keely Hadley

Ms. Hadley watched most of the incident from inside her house, looking out from time to time through her window. During the final phase, she described Mr. Turnbow as being in a kneeling position, then attempting to stand. Although she didn't see anything in his hands as he tried to get up, she testified that the gun was beside him where he could grab it if he chose. She also admitted that a tree obscured her view and she could not see his hands clearly. (Hadley Dep. 16:24-22:9, July 14, 2008)

Miguel Velasquez

Mr. Velasquez described the final moments of the shootout: "He [Mr. Turnbow] was on the side of the curb. They told him, 'Freeze, don't move.' And he was breathing like going . . . gasping for air, trying to get up. And after that they blew about another 45 rounds in him." (Velasquez Dep. 27:2-6, May 9, 2008) He testified that even after being told to freeze, Mr. Turnbow continued to move because, according to Mr. Velasquez, "he was gasping for air. How are you going to stay still and freeze if you're breathing and trying to, you know, stay alive?" (Id.

33:22-25) Although Mr. Turnbow was not holding the gun, Mr. Velasquez admitted that the gun was within Mr. Turnbow's reach and his hands were moving (Mr. Velasquez believed that Mr.Turnbow's hand movements were part of his desperate attempt to breathe). (Id. at 35:4-36:4)

John (Tony) Gomez

Mr. Gomez is another witness who gave one story in his statement to the police and a different story in his deposition. In the statement Mr. Gomez gave to police the night of the shooting, he stated that he went inside his house after hearing the first shots. In his deposition testimony, he testified that although he did go inside his house, he went back outside and saw the end of the shooting. According to Mr. Gomez's deposition testimony, Mr. Turnbow was on his knees, gasping for breath. The police told him "'freeze don't move.' And he was moving, but he was moving because he was dying." (Gomez Dep. 28:24-25, May 9, 2008)

Expert Witnesses

Plaintiffs submitted the testimony of Ian Sheperd, a private investigator with expertise in firearm and forensics. Mr. Sheperd is not a medical doctor. Mr. Sheperd's opinion was that several of Mr. Turnbow's wounds would have been "completely and instantaneously incapacitating." (Sheperd Dep. 49:1-4, Oct. 7, 2008) But he agreed that he didn't know when Mr. Turnbow was shot in the head or in the groin and torso (apparently, these wounds were the ones Mr. Shepherd believed were "incapacitating"). (Id. at 51:4-15) Mr. Shepherd admitted that he could not say "with a reasonable degree of medical certainty" that the shots to Mr. Turnbow's groin and torso were disabling. (Id. at 50:3-52:13) Mr. Shepherd testified that even after having been shot in the torso and groin, Mr. Turnbow might have been able to move his arms. (Id. 52:20-22)

Mr. Shepherd opined that "[b]ecause of the light conditions, I seriously believe the officers would not have been able to tell whether or not Mr. Turnbow had a gun in his hand." (Id. 53:15-20) And, in Mr. Shepherd's view, if the officers believed that Mr. Turnbow was holding a gun, the officers were justified in using "deadly force." (Id. 54:10-14) Finally, Mr. Shepherd testified that once Mr. Turnbow was on the ground and "substantially disabled," he "potentially" could have been a "lethal threat." (Id. 61:8-10)

Plaintiffs' second expert was David Doddridge, a retired police officer. Mr. Doddridge testified that at the end of the incident, it was "possible, very possible" that Mr. Turnbow was reaching for his gun. (Doddridge Dep. 66:15-18, Sept. 15, 2008) He also believed that during phase three, "[t]here was a potential of immediate threat." (Id. 97:9)

## DISCUSSION

Plaintiffs contend that Mr. Turnbow's Fourth and Fourteenth Amendment right to be free from the use of excessive force was violated when the officers shot him during the second and third phases of the encounter.[2] The officers argue they are entitled to qualified immunity. After a defendant pleads qualified immunity, as here, it is the plaintiff's burden to demonstrate that the defendant violated a specific constitutional right. Saucier v. Katz, 533 U.S. 194 (2001). The qualified immunity inquiry is two part. First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. at 201. If the answer is yes, the court must then ask whether the right was clearly established. Id. Although this court is no longer required to address these two issues in the rigid

---

[2]Plaintiffs allege several constitutional violations. But all alleged violations center on the claim of excessive force and fall within the Fourth Amendment.

order proscribed by Saucier, the traditional order best suits this highly fact-driven case. Pearson v. Callahan, 129 S. Ct. 808, 821 (2009).

Accordingly, the court must consider whether the facts, taken in the light most favorable to Plaintiffs, support their claim that Mr. Turnbow's Fourth amendment rights were violated. "The use of deadly force is justified under the Fourth Amendment if a reasonable officer in the Defendant's position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." Phillips v. James, 422 F.3d 1075, 1083 (10th Cir. 2005 (quotation omitted). Excessive force claims are evaluated under the Fourth Amendment standard of objective reasonableness judged from the perspective of a reasonable officer on the scene. Graham v. Connor, 490 U.S. 386, 396-97 (1989). "Because police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation, the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." Saucier, 533 U.S. at 205 (citations and quotations omitted). Officers are not required to use alternative, less intrusive means if their conduct is objectively reasonable. Medina v. Cram, 252 F.3d 1124, 1133 (10th Cir. 2001).

The totality of the circumstances must be considered in evaluating an excessive force claim, including "whether the officers were in danger at the precise moment that they used force and whether Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." Phillips, 422 F.3d at 1083. An officer is not required to be correct in his assessment of the situation. "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back the officer would be justified in using more force than in fact

was needed." Jiron v. City of Lakewood, 392 F.3d 410, 415 (10th Cir. 2004) (quotation and alteration omitted).

Taken in the light most favorable to Plaintiffs, the evidence shows that at the time the officers fired the final shots, Mr. Turnbow was moving and his gun was within arm's reach. The witnesses most favorable to the Plaintiffs agree that Mr. Turnbow was trying to get up or moving his arms. They also all agree that the gun was close by when Mr. Turnbow was moving. Plaintiffs' experts also acknowledge that Mr. Turnbow was likely moving in some fashion when he was shot. It is undisputed that the officers' told Mr. Turnbow many times to "freeze" and any movement would have been in violation of that order.

Given the circumstances surrounding the shooting, the officers could have reasonably believed that he was reaching for his gun to resume firing on the officers. The officers faced a situation in which an individual (1) had been acting erratically before the encounter began by firing a shotgun while walking down the street; (2) had fired on them many times; (3) refused to comply with any orders; (4) continued shooting after sustaining serious injuries; (5) gave indications that he wanted to be shot; and (6) never communicated any desire to end the shooting or to surrender. Furthermore, these events took place in the early evening hours of December and the light conditions were not ideal.

Mr. Turnbow's actions during the encounter were unreasonable from the inception. By firing on the officers he created a situation in which he would be deemed a threat, absent compelling evidence to the contrary. There was no reason the officers would have to wait to see Mr. Turnbow raise the gun and be certain of his intentions before shooting at him. See Phillips v. James, 422 F.3d at 1084. Under these circumstances, it was not unreasonable for the officers

to believe that Mr. Turnbow posed a serious threat of physical harm when he was moving in violation of the officers' orders and his gun remained in close reach. See id. at 1083-84.

Because the officers committed no constitutional violation, Ogden City is not liable. The Defendants are therefore entitled to summary judgment on all constitutional claims. Furthermore, the court declines to exercise supplemental jurisdiction over Plaintiffs' related state claims.

## ORDER

For the foregoing reasons, Defendants' motion for summary judgment (Docket No. 64) is GRANTED.

DATED this 18th day of March, 2009.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge